USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan. 28, 2014

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------- X
In Re: GRAND JURY PROCEEDINGS,   :
                                 :    No. 13 Misc. 153
GERALD KOCH,                     :
                                 :    **OPINION & ORDER**
        Movant.                  :
----------------------------------- X

APPEARANCES

For Movant Gerald Koch:
    Susan V. Tipograph

For United States of America:
    Preet Bharara
    United States Attorney, Southern District of New York
    By: John P. Cronan
        Michael D. Lockard

**JOHN F. KEENAN, United States District Judge:**

Movant Gerald Koch is presently confined at the Metropolitan Correctional Center because this Court found him to be in civil contempt. Koch has chosen to remain in contempt — indeed, he promises continued and endless contempt — but petitions the Court to be released so that he might be spared the remaining consequences of his choice. For the reasons that follow, the motion is granted.

## I.  Background

On September 10, 2009, Koch was subpoenaed to testify before a grand jury.[1] Invoking his Fifth Amendment right against

---

[1] In view of Rule 6 of the Federal Rules of Criminal Procedure, it would not be appropriate to set forth the nature of the grand jury investigation. See Fed. R. Crim. P. 6(e)(2). It suffices to note, as

-1-

self-incrimination, Koch refused to answer questions before the grand jury.  Judge Sullivan, the Part I District Judge at the time, conducted an ex parte and in camera evaluation of Koch and determined that his testimony before the Grand Jury could implicate him within the meaning of the Fifth Amendment.

After pursuing other avenues of investigation for several years, the Government gave immunity to Koch and sought to compel him to testify under 18 U.S.C. §§ 6002 and 6003.  Consequently, on April 11, 2013, Part I District Judge Sweet issued an order compelling Koch to testify before the grand jury.

On or about May 7, 2013, after I began presiding in Part I, Koch moved to quash the subpoena.  His position was built upon two propositions:  first, the general proposition that grand juries are an illegitimate abuse of prosecutorial power by the federal government; and second, the specific proposition that Koch possesses no information that would further this particular grand jury investigation, and therefore is being unfairly targeted by the oppressive government.  According to Koch, the Government subpoena was based upon his political beliefs and would be used by the Government to obtain protected information about his activist associates.

---

the Second Circuit did, that "[t]he grand jury convened in this matter is investigating a serious crime, and the government has made a convincing showing of its need to ask the questions at issue." ABC v. Koch, --- F. App'x ----, 2013 WL 6225042, at *3 (2d Cir. 2013).

This Court denied Koch's motion, in part because it was utterly groundless both in law and in fact. See Sealed Order of May 15, 2013.  Koch's theory of this matter is a delusion of grandeur.  There is simply no evidence that the Government, threatened by Koch's subversive prowess, seeks to bring him before the grand jury on a pretext, either to gain access to the treasure trove that is his circle of friends or to send an ominous message to political dissidents. See In re Jean-Baptiste, No. M 11-188, 1985 WL 1863, at *2 (S.D.N.Y. July 5, 1985) (Leisure, J.) ("Even if it were true that grand juries routinely are used as instruments for suppressing legitimate dissent . . . I have been provided with no evidence, by affidavit or otherwise, that the grand jury in this case was involved in anything other than an investigation into suspected criminal activities.").  Indeed, the evidence before this Court suggests the opposite.  The Government set forth in a prior ex parte submission the basis for its belief that Koch may have knowledge about the incident that is the grand jury's concern. See Sealed Order of May 15, 2013.

Koch then moved for an order directing the Government to disclose its alleged illegal electronic surveillance of him. The Government responded by averring to the Court, under penalty of perjury, that there had been no electronic surveillance of Koch and that the subpoena compelling him to testify had not

been predicated on any electronic surveillance of him.  The Court therefore denied Koch's motion as meritless and, noting that he had been granted immunity, again ordered him to answer questions before the grand jury.  See Order of May 20, 2013 (ECF No. 7.).

After Koch again refused to comply, this Court held a proceeding on May 21, 2013.  The Court ultimately found him to be in contempt of court for violating the multiple Orders compelling him to testify despite receiving immunity from prosecution.  He was confined later that day.

Koch next appealed this Court's contempt finding to the Second Circuit. See Koch, 2013 WL 6225042.  The Circuit panel ruled that the Government "properly demonstrated that it seeks Koch's testimony related to the crime based on credible evidence that he may have information regarding the underlying events, and the information sought relates directly to the crime in question." Id. at *3.  As to the propriety of the questions asked of Koch, the panel determined that they were not designed to unduly trample upon his First Amendment rights.  "To the contrary, these questions focus specifically on his knowledge of the criminal conduct under investigation." Id.  The Second Circuit thus summarily affirmed this Court in all respects.

Koch now seeks to be released from the MCC.  He asserts that continued confinement will not induce him to cooperate with

the grand jury, and so he would rather be freed today instead of at the end of the eighteen-month maximum set by Congress. See 28 U.S.C. § 1826(a).

## II. Discussion

### A. Legal Standards

#### 1. 28 U.S.C. § 1826 and Simkin v. United States

At first blush, it may be surprising to observers that a citizen can be confined absent criminal charges.  That the grand jury is necessarily nonpublic — a fact that Koch has capitalized upon when publicizing his rather hyperbolic version of the story — may contribute to initial skepticism about the process.  It is therefore appropriate to set forth some of the established principles of law at work in this matter.

The grand jury is a centuries-old "constitutional fixture." United States v. Williams, 504 U.S. 36, 47 (1992) (citations and internal quotations omitted); see Marc Rich & Co. v. United States, 707 F.2d 663, 666 (2d Cir. 1983).  The grand jury has not merely the right, but indeed the duty, "to inquire into the existence of possible criminal conduct." Marc Rich & Co., 707 F.2d at 665.  Accordingly, it may investigate "merely on suspicion that the law is being violated, or even because it wants assurance that it is not." Williams, 504 U.S. at 48; see United States v. Stone, 429 F.2d 138, 140 (2d Cir. 1970) ("A grand jury's investigation is not fully carried out until every

available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.").

In light of this broad mandate, the grand jury's investigative powers are necessarily broad, in keeping with the principle that the public "has a right to every man's evidence." E.g., Branzburg v. Hayes, 408 U.S. 665, 688 (1972) (citations omitted). This recitation of the law is not novel or controversial; rather, it is a "fundamental maxim" that in this verbiage traces back to 1742. 12 Hansard's Debates 693, quoted in 8 Wigmore, Evidence (3d ed.) p. 64, § 2192; see also Charles E. Moylan, Jr. and John Sonsteng, The Privilege Against Compelled Self-Incrimination, 16 Wm. Mitchell L. Rev. 249, 252 (1990) ("Anglo-American common law does not start with a general right to silence, but with its opposite."). And as the Second Circuit has confirmed, "nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena." In re Grand Jury Proceedings, 219 F.3d 175, 186 (2d Cir. 2000) (citation and internal quotation marks omitted).

In the instant case, Koch has been confined pursuant to section 1826(a) of Title 28 of the United States Code. That section was enacted as

> part of a congressional response to a critical problem faced by the criminal justice system. It is a recognized fact that there are certain types of criminal conduct (including terrorism and the furtherance of organized crime) which threaten the

>very fabric of our society and which, as a practical
>matter, cannot be prosecuted unless "insiders" are
>persuaded or compelled to testify against their
>accomplices.  As part of its effort to deal with this
>problem Congress (having in 18 U.S.C. §§ 6002 and 6003
>authorized the grant of use immunity), in § 1826(a)
>authorized prosecutors to confront a potential witness
>with the choice of testifying or facing up to eighteen
>months in jail.  It was hoped that the coercive effect
>of such a threat would produce a significant amount of
>relevant testimony.

In re Cocilovo, 618 F. Supp. 1378, 1380 (S.D.N.Y. 1985) (citing H.R. Rep. No. 91-1549 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4022).

Section 1826 provides that when a witness before a grand jury "refuses without just cause shown to comply with an order of the court to testify or provide other information," a court "may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information."  The statute grants no exemptions for those who prefer not to testify, nor for political activists, nor for those who claim that they have no testimony to give.  This is because, like it or not, "it is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned." Blair v. United States, 250 U.S. 273, 281 (1919).  Thus, "no witness may place his personal views to the contrary, however strongly held, ahead of his duty to

testify or comply with lawful orders of a duly constituted court or grand jury." In re Thornton, 560 F. Supp. 183, 185 (S.D.N.Y. 1983).

The statute further provides that a contemnor's confinement must not last longer than the term of the grand jury, nor may it exceed eighteen months. 28 U.S.C. § 1826(a).  The Second Circuit has stated that because the civil contempt sanction is meant to coerce, rather than to punish, a district judge may release a contemnor who meets his burden of demonstrating that there is no realistic possibility he will choose to testify. See Simkin v. United States, 715 F.2d 34, 37–38 (2d Cir. 1983).  However, "the issue is not whether the contemnor believes there is no realistic possibility that continued confinement might cause him to testify; rather, it is whether the district judge believes, based on all the circumstances pertinent to that contemnor, that no such realistic possibility exists." In re Parrish, 782 F.2d 325, 327–28 (2d Cir. 1986).  Essentially, the judge is called upon to predict whether the contemnor has in turn correctly predicted his own obstinacy.

This, the Second Circuit has acknowledged, is a "perplexing task." Simkin, 715 F.2d at 37.  In deciding whether a contemnor may be compelled to testify, one district court has remarked that the "only absolute rule is that there are none." United States v. Buck, Nos. 84 Cr. 220, 82 Cr. 312, 1987 WL 15520, at

-8-

*1 (S.D.N.Y. July 31, 1987) (Haight, J.).  One thing that is settled, however, is that the matter is ultimately left to the district judge's "virtually unreviewable discretion[,] both as to the procedure he will use to reach his conclusion, and as to the merits of his conclusion." E.g., Simkin, 715 F.2d at 38 (citations omitted).

### 2. Criticism of the Simkin "No Realistic Possibility" Framework

Counterintuitive though it may seem, under Simkin and its progeny a grand jury resister can be confined because of his contumacy and then released for that very same contumacy.  By this reasoning, the refusal to testify is somehow transmogrified from a lock to a key.  Nearly thirty years ago, three distinguished judges of this Court observed the perverse results compelled by the precedent.

In civil contemnor Dorie Clay, the late Chief Judge Charles L. Brieant was confronted with a self-styled grand jury resister who, he wrote, "perceives herself as an enemy soldier; she is not part of the social compact which binds this country together, and she does not feel that she will, or could, receive Justice from our Courts.  That she is wrong is beside the point." In re Clay, No. M-11-188, 1985 WL 1977, at *2 (S.D.N.Y. June 27, 1985).  Although Judge Brieant would have denied her application for release, thereby leaving "the keys to her cell in effect in her own pocket," id., he concluded that he was

compelled to release Ms. Clay under <u>Simkin</u>, which had recently been decided. Following the logic of that case, he reasoned that

> the more disrespect the witness shows for a grand jury and for the Court, and the greater the showing of a refusal to obey the Court, even in the face of a possible lengthy confinement, the more likely the witness is to be released. Such a rule does not foster the end of obtaining the witness's testimony and encourages disobedience of the Court's order to testify, thereby interfering with the efforts of the Grand Jury in obtaining information that will enable it to fulfill its investigative function. The result in <u>Simkin</u> undermines by judicial fiat that power which Congress, in its wisdom, felt necessary for the Court to have in order to compel witnesses to comply . . . . [L]acking some rational basis to distinguish or limit the holding of <u>Simkin</u>, supra, this Court is bound by law and conscience to discharge Ms. Clay, an absurd result, since if she were less resistant she would be retained in custody.

<u>Id.</u> at *3-4.

Judge Knapp declared himself in agreement with Judge Brieant in at least three decisions of his own. He wrote that in releasing contemnor Milton Parish, "the result I reached was unwarranted, and would not have reached it except under compulsion." <u>In re Parish</u>, 613 F. Supp. 356, 357 (S.D.N.Y. 1985), <u>aff'd</u>, 782 F.2d 325; <u>see also</u> <u>In re Papadakis</u>, 613 F. Supp. 109 (S.D.N.Y. 1985). Judge Knapp predicted that "the <u>Simkin</u> case will ultimately render the statute unworkable and thus nugatory," <u>Parish</u>, 613 F. Supp. at 357, a view he elaborated upon in a later case:

> Once the [prior precedent] — focussing on the purpose of the sentence and the contemnor's continuing ability to respond to the subpoena — is rejected in favor of an obligation to make a case by case determination of the strength of the contemnor's intransigence, we are off on an uncharted sea. I predict that the outcome will be an almost routine release of contemnors after about six months. The plain fact of the matter is that once a person has served six months in jail with no sign of weakening, there will rarely be any valid reason for assuming that the next twelve months (or any fractions thereof) are going to be any more effective.

<u>Cocilovo</u>, 618 F. Supp. at 1381.

Finally, Judge Sweet granted the motion for release of Jean Ford, a civil contemnor who believed "that the grand jury is a 'political intelligence gathering body that is being used as a means to derail different constitutionally protected resistance movements,'" and who further felt that "to testify before the grand jury would be a betrayal of these 'comrades' and would have serious personal consequences for him as he would be viewed as a traitor to his cause and to his people." <u>In re Ford</u>, 615 F. Supp. 259, 261–62 (S.D.N.Y. 1985). Judge Sweet concluded that he had to release Ford from confinement, but did so

> despite my conviction that the logical result of <u>Simkin</u> and <u>Sanchez</u> is to emasculate the civil contempt sanction, since any organized resistance to a grand jury investigation will result in the release of any contemnor who can demonstrate a real involvement with that effort. This is true whether the individuals resisting the investigation are members of a political organization or of an organized crime group. . . . <u>Simkin</u> and <u>Sanchez</u> have the perverse result of creating a special, more lenient standard for that

> class of contemnor most committed to defying the court's order and thus least entitled to relief.

Id. at 262.

The Simkin "no realistic possibility of compliance" standard has also been criticized in legal scholarship. One author has argued that the framework misjudges the contemnor's incentives, especially for those who are most intransigent. Linda S. Beres, Civil Contempt and the Rational Contemnor, 69 Ind. L.J. 723, 757 (1994) ("It makes little sense to present hardened criminals, fanatical terrorists, and other seemingly stubborn contemnors with a lower expected period of incarceration than other individuals. Their moral culpability may be particularly high and the social costs of keeping them incarcerated may be especially low."). She also points out that the Simkin standard gives judges no legitimate way to consider the moral culpability of contemnors. See id. at 734–36 ("[J]udges appear reluctant to release contemnors who are suspected of involvement in terrorist activities, membership in organized crime families, or involvement in other criminal activity. Such considerations, however, have no bearing on whether a contemnor can be coerced."). This concern is echoed by another observer, who asserts that Simkin "treats with extreme leniency egregious crimes such as terrorism that base their justification on moral, religious, or political

-12-

principles." Jessica Pae, Note, <u>The Emasculation of Compelled Testimony:  Battling the Effects of Judicially Imposed Limitations on Grand Jury Investigations of Terrorism and Other Ideological Crimes</u>, 70 S. Cal. L. Rev. 473, 516 (1997).  She concludes that the framework "makes it virtually impossible to extract information regarding ideological crimes in which the government may have a particularly strong interest because of the extreme danger such crimes pose to the public." <u>Id.</u> at 476.

Although there is good reason to doubt the wisdom of the <u>Simkin</u> precedent, this Court is bound by it.  If the Court concludes that continued confinement would not induce Koch to testify before the grand jury, then he must be released.  From this dubious but settled principle, we proceed to an individualized consideration of Mr. Koch.

## B.  Analysis

Koch's argument is straightforward.  Because he continues to oppose the government in general and the grand jury process in particular, he urges that continued confinement will not induce him to testify.  Indeed, he asserts that his tenure at the MCC has caused his views about government repression to congeal even further. <u>See</u> Koch Br. at 13 ("Every fresh insult associated with his imprisonment serves only to vindicate his beliefs about the failure of the grand jury system to comport with his vision of justice.").

Koch has provided the Court with several exhibits in support of his motion. The exhibits contain, among other items, seventeen letters of support from family, friends, and professors; a Change.org petition purportedly addressed to the United States Attorney for the Southern District of New York; and several news articles and internet posts. Although the Court always considers exhibits properly filed in support of a motion, these materials are especially deserving of review and scrutiny because they were <u>not</u> written by Koch, whose own avowals might ultimately be disregarded as self-serving and unreliable. See In re Dohrn, 560 F. Supp. 179, 180 (S.D.N.Y. 1983) (stating that "a contemnor's self-serving statement that he or she will not cooperate should not, by itself, be considered by courts in determining whether to impose or continue to enforce an order of civil contempt").

Accordingly, the Court has carefully considered these submissions to aid in its assessment of whether coercion might yet be accomplished. By and large, the submitted letters of support are thoughtful. While several misapprehend the circumstances of Koch's contempt, all of the letters are probative on the subject of his resolve. The various adjectives used — "entrenched," "defiant," "reactive," "uncompromising," and most commonly, "stubborn" — illustrate the authors' united belief that continued confinement will not change Koch's

position.  While the authors are plainly motivated by the hope that the instant motion will be granted, their letters otherwise bear no indicia of unreliability.  The Court finds them credible.

The exhibits containing the Change.org petition, news articles, and internet posts are less compelling.  For the most part, these items are less personal than the letters described above and convey greater ignorance or mischaracterizations of the circumstances of this matter.  But these materials are nevertheless somewhat helpful in one respect:  they demonstrate the degree to which Koch has publicly staked out his position of non-cooperation.  He has purposefully cultivated this persona among his political community and sympathizers.  Regardless of how breathtakingly misinformed many of these people are about both the law and the facts at hand, it seems clear that Koch would lose their admiration and fellowship should he abandon his obstinacy and testify before the grand jury.  Judge Sweet's analysis from In re Ford seems especially applicable:

> [H]e sees himself as a political crusader and enjoys the support and attention of not only his fellow contemnors but also that portion of the community which supports the underlying "cause."  The element of "group think" generated by an organized group of individuals who call themselves freedom fighters and espouse the maintenance of a "wall of silence" may well be the sole reason for [his] refusal to testify and in any event, plainly reinforces his decision to remain silent.  I am convinced that whether or not [he] would continue to testify if he were alone in his

-15-

>alleged beliefs, given the support he receives from this group of "resisters" he is unlikely to change his mind and risk losing his newly acquired status as a hero.

Ford, 615 F. Supp. at 62.

The Court also considers Koch's sworn declaration, albeit with a grain of salt. See Parrish, 782 F.2d at 327 ("It should be obvious that the contemnor's assertion that he will never testify need not be accepted at face value."). Most of the declaration is dedicated to repeating Koch's beliefs about government repression and harassment. Aside from that fanciful manifesto, Koch also purports to renounce the crime that is the subject of the grand jury's investigation, and again professes his uselessness to the investigation. Koch's public pronouncements to this effect have apparently been accepted at face value by his family and sympathizers. The Government's prior submissions, Judge Sullivan's finding that Koch was in danger of self-incrimination, and several of Koch's statements have led the Court to a more skeptical view of his representations. In deciding the instant motion, however, the Court need not decide whether Koch is being truthful when he says that his testimony may be incriminating, or if he is instead being truthful when he says he knows nothing of value. Cf. Jean-Baptiste, 1985 WL 1863, at *4 n.5 (noting that the

contemnor's culpability is not necessarily related to intransigence).

Koch's declaration also discusses the effects that confinement has had on his health. He states that he has lost weight and has suffered painful side effects from a joint condition. His mental health has also deteriorated, as separation from his loved ones and the interruption of his pursuits has aggravated his depression. These representations are echoed by his counsel and in many of the submitted letters, and the Court has no reason to disbelieve them. By all accounts, confinement is making Koch increasingly miserable.

The Court is sympathetic regarding Koch's poor health and shares the concern for his well-being, although this concern is not itself a basis for release. What matters is how Koch's health or happiness at the MCC will affect his reluctance to testify. Indeed, one could argue that his deterioration provides him with an added incentive to testify and thereby secure his own release. See In re Grand Jury Investigation (Joseph Braun), 600 F.2d 420, 428 (3d Cir. 1979) (declining health "could just as well be seen as weighing in favor of the coercive impact of additional confinement").

In this case, however, the Court finds it more likely that Koch will only derive increasing grim self-satisfaction from his position. The more unstable he gets, the more he will be

presented as a martyr and perceive himself as such.  Koch has already decided that this type of notoriety is more valuable than his health and freedom in the short run, and the Court sees no basis to conclude that he will reverse that calculus.  <u>See</u> Beres, <u>supra</u>, at 731 ("If the contemnor believes that he has more to lose by complying than he does by going to [or remaining in] jail, he cannot be coerced into obeying the court order.").

The Government urges that Koch has failed to meet his burden of demonstrating that no realistic possibility remains that he will decide to testify.  It notes a number of purported weaknesses or inconsistencies in Koch's submission.  In the Court's view, none of these change the essential fact of Koch's contumacy.

The Government's strongest argument against release is that "Koch's refusal to comply with the Subpoena to date has been motivated at least in part by his hope to escape confinement through resort to judicial process." (Gov. Opp. at 9.)  It notes that Koch immediately appealed this Court's contempt finding, and filed the instant motion shortly after the Second Circuit rejected that appeal.  The Government therefore asks me to infer that if this motion is denied, Koch might decide that his judicial options are exhausted and choose to testify.  In the abstract, such an inference seems logical.  An analogy may be made to a defendant in a criminal case who initially pleads not

guilty to the charges against him, but who changes his mind and cooperates with the Government after the judge denies his pretrial motions.

The Court is nevertheless not persuaded that this logic applies to the instant matter.  As discussed earlier, the Court believes that Koch is governed by different incentives that will cause him to remain in contempt even if this motion is denied.  Moreover, as the Government acknowledges, the judicial process is never truly "exhausted" for a civil contemnor because, under the Simkin line of cases, the Court has a continuing obligation to assess the efficacy of confinement.  See In re Grand Jury Subpoena John Doe, 150 F.3d 170, 172 (2d Cir. 1998) (per curiam).  There will thus never come a time for Koch where his only remaining option is to cooperate.

In sum, the Court concludes that continued confinement will not move Koch from the reflexive ideology that forbids his cooperation with the serious investigation at hand.  By all indications, Koch's reaction to his present situation has not been to examine his assumptions about what the grand jury seeks to accomplish.  Instead, he has further submerged himself in the rhetoric of a community whose ideas about the government are so engrained and misguided as to utterly ignore any fact that would undermine them.  He has thereby become fully inculcated with the partisan zeal of one who is often in error but never in doubt.

Koch and his ilk seem to believe that being a proper dissident means that one must adhere uncritically to his own worldview. He has condemned the crime in question, but if he takes the logical next step of assisting in the investigation of that crime, he will be excommunicated by the anarchist community he cherishes. Their rigidity is symptomatic of an ideology that prizes conformity over independent thought. Ironically, far from articulating any genuine dissent, these "anarchists" have accomplished little more than substituting one flavor of authoritarianism for another.

The Court sees no indication that Koch's doctrinaire fever will break in the foreseeable future. Consequently, there is no realistic possibility that he will choose to testify before the grand jury. His motion must be granted.

### III.  Conclusion

For the foregoing reasons, Koch's motion for release is granted. The Court directs that he be discharged from custody.

**SO ORDERED.**

Dated:   New York, New York
         January 28, 2014

*John F. Keenan*
John F. Keenan
United States District Judge
Part I